IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DITRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 12-0362-CV-W-GAF |
| | ) | |
| 1,149/4 ounce round metal tins, et al. | ) | Judge Gary A. Fenner |
| | ) | |
| Defendants. | ) | |

**RULE 12(b) MOTION TO DISMISS**

Now comes Claimant Samuel A. Girod, owner of S.A.E.G with a residence at 409 Satterfield Lane, Owingsville, Kentucky 40360, through counsel, and submits his Rule 12(b)(1) and (6) Motion to Dismiss for a lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. Support for Girod's Motion to Dismiss is set forth in the Memorandum below.

**MEMORANDUM**

**A. Background.**

On March 27, 2012 the Federal Food and Drug Administration (FDA) caused to be filed an *in rem* complaint against several articles, i.e. 1,149 can of Chickweed Healing Salve; 244 cans of To-More Gone; and 316 bottles of R.E.P. The articles were made by S.A.E.P. and were located at Notions-n-Things at 20497 Hwy 6, Bogard, Missouri (see Doc # 3). A warrant was issued and the articles were seized by U.S. Marshals on the same day or the day after (see Doc #7). The articles are currently in the possession of the United States Marshal. The United States followed the admiralty procedure set out under Supplemental Rule G(3) when it issued the Complaint and the warrant.

The AUSA filed a Notice to Samuel A. Girod on April 17, 2012 (Doc #8) which was served on April 20, 2012 (Doc #10) and Girod, acting in a *pro se* capacity, timely filed a claim for the articles on May 15, 2012. Subsequently, Girod retained counsel. Due to the difficulty in locating local counsel to sponsor him, Girod's counsel contacted the ASUA James Curt Bohling and obtained oral permission for Girod to file an appropriate response to the Complaint by the end of June. Accordingly, Girod now submits his Rule 12(b) Motion to Dismiss because the Court lacks subject matter jurisdiction and the government failed to state a claim for relief.

**B. Court Lacks Jurisdiction.**

    **a. Claimed Jurisdiction Under Interstate Commerce**

It is well settled law that "it is the burden of the 'party who seeks the exercise of jurisdiction in his favor,' … 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" see *United States v. Hayes*, 515 U.S. 737, 743, 115 S. Ct. 2431, 132 L.Ed.2d 635 (1995) quoting from *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed 1135 (1936) and *Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed2d 343 (1975). Furthermore,

> "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, see *Willy v. Coastal Corp.*, 503 U.S. 131, 136-137 (1992); *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541 (1986), which is not to be expanded by judicial decree, *American Fire & Casualty Co. v. Finn*, 341 U.S. 6 (1951). It is to be presumed that a cause lies outside this limited jurisdiction, *Turner v. Bank of North-America*, 4 Dall. 8, 11 (1799), and the burden of establishing the contrary rests upon the party asserting jurisdiction, *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 182-183 (1936)."

In this case the United States has claimed jurisdiction through 28 U.S.C. §1345 and 21 U.S.C. §334. The United States first claim of jurisdiction is founded on 28 U.S.C. §1345, which states,

> "Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the

United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

On its face §1345 does not confer jurisdiction except an indefinite reference to some jurisdiction expressly authorized by an Act of Congress. Thus, to establish jurisdiction reference must be made to a specific Act of Congress authorizing the United States to sue. The United States claims such jurisdiction through 21 U.S.C. §334 of the Federal Food, Drug, and Cosmetic Act, see attached 21 U.S.C. §334.

Section 334(a) purports to give jurisdiction to the United States to institute a proceeding against "any article of food, drug, or cosmetic that is adulterated or misbranded when introduced into or while in interstate commerce or while held for sale (whether or not the first sale) after shipment in interstate commerce." Section 334(b) purports to give the United States authority to proceed in procedural manner which shall "conform, as nearly as may be, to the procedure in admiralty." The procedure followed in this case permitted the seizure of the articles belong to Sam Girod under the admiralty rule of procedure, specifically Supplemental Rule G(3).

**b. Congress lacks Authority to Violate Inalienable Rights.**

**1. Interstate Jurisdiction not Unlimited.**

It is well settled that Congress has broad authority to regulate interstate commerce, but that authority is not unlimited. The Supreme Court stated in *Gibbons v. Ogden*, 22 U.S. 1, 3, 6 L.Ed. 23 (1824), "The power to regulate commerce is general, and has no limitations but such as are prescribed in the constitution itself." The principle that Congress' power to regulate interstate commerce is limited by the Constitution was reiterated in *United States v. Lopez*, 514 U.S. 549, 552-116 S.Ct. 1624, 131 L.Ed2d 626 (1995), where the Supreme reaffirmed *Gibbons* with the following statement:

We start with first principles. The Constitution creates a Federal Government of enumerated powers. See Art. I, § 8. As James Madison wrote: "The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." The Federalist No. 45, pp. 292-293 (C. Rossiter ed. 1961). This constitutionally mandated division of authority "was adopted by the Framers to ensure protection of our fundamental liberties." *Gregory v. Ashcroft,* 501 U.S. 452, 458 (1991) (internal quotation marks omitted). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Ibid.*

The Constitution delegates to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, § 8, cl. 3. The Court, through Chief Justice Marshall, first defined the nature of Congress' commerce power in *Gibbons v. Ogden*, 9 Wheat. 1, 189-190 (1824):

"Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse."

The commerce power "is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. ***This power, like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution.***" *Id.,* at 196. The *Gibbons* Court, however, acknowledged that limitations on the commerce power are inherent in the very language of the Commerce Clause. (Emphasis added)

The recently decided case of *National Federation of Independent Business v. Selelius*, No. 11-393, Slip Opinion, June 28, 2012 confirms the principle that the interstate commerce powers of Congress does in deed have limits.

Quoting from *McCulloch* v. *Maryland*, 17 (4 Wheat) U.S. 316, 405, 4 L.Ed.579 (1819), Chief Justice Roberts stated,

"The Federal Government 'is acknowledged by all to be one of enumerated powers.' *Ibid*. That is, rather than granting general authority to perform all the conceivable functions of government, the Constitution lists, or enumerates, the Federal Government's powers." See page 2 of Slip Opinion.

Further affirmation of the limitations that the Bill of Right places on Congress regarding the commerce powers is explained on page 3 of the Slip Opinion.

4

> "Today, the restrictions on government power foremost in many Americans' minds are likely to be affirmative prohibitions, such as contained in the Bill of Rights. These affirmative prohibitions come into play, however, only where the Government possesses authority to act in the first place. If no enumerated power authorizes Congress to pass a certain law, that law may not be enacted, even if it would not violate any of the express prohibitions in the Bill of Rights or elsewhere in the Constitution.
>
> Indeed, the Constitution did not initially include a Bill of Rights at least partly because the Framers felt the enumeration of powers sufficed to restrain the Government. As Alexander Hamilton put it, 'the Constitution is itself, in every rational sense, and to every useful purpose, A BILL OF RIGHTS.' The Federalist No. 84, p. 515 (C. Rossiter ed. 1961). And when the Bill of Rights was ratified, it made express what the enumeration of powers necessarily implied: "The powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or to the people." U. S. Const., Amdt. 10. The Federal Government has expanded dramatically over the past two centuries, but it still must show that a constitutional grant of power authorizes each of its actions. See, *e.g., United States* v. *Comstock*, 560 U. S. ___ (2010)."

Finally, on page 23 of the Slip Opinion, Justice Roberts in quoting from *Maryland* v. *Wirtz*, 392 U. S. 183, 196 (1968) acknowledged the time honored principle that Congress' power under the commerce clause does have limits when he stated,

> "While Congress's authority under the Commerce Clause has of course expanded with the growth of the national economy, our cases have 'always recognized that the power to regulate commerce, though broad indeed, has limits.'"

In this case Congress has exceeded its Constitutional limitations. To allow Congress to use admiralty procedure to evade the limitations of the Bill of Rights would erode the Constitutional limits of the Bill of Rights.

**2. Constitutional limitations.**

The property seized through admiralty procedures was the property of the person of Samuel A. Girod. The government's duty to protect the property of its people is derived from the Declaration of Independence and the Constitution. The Declaration of Independence states in part,

5

> "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.--That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed."

These inalienable rights of persons that the government was entrusted with were codified in the first ten amendments known as the Bill of Rights, See *District of Columbia v. Heller*, 554 U.S. 570, 592, 128 S.Ct. 2783, 171 L.Ed 2d 637 (2008) (We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right.). Claimant Sam Girod is a person and is entitled to have his inalienable rights protected by the government, not abused.

Under 21 U.S.C. §331 of the Federal Food, Drug, and Cosmetic Act, Congress has declared a number of prohibited acts involving interstate commerce. The introduction into interstate commerce of articles that meet the definition of a new drug under §321(p) and a misbranded drug under §352(f)(1) are prohibited. It is under these statutes the United States claims its authority to seize Girod's property. The rights the government has violated in seizing Girod's personal property are as follows:

1. The First Amendment right of freedom of speech;
2. The Fourth Amendment right to be free from unreasonable seizure of his property; and
3. The Fifth Amendment right not to be deprived of life, liberty, or property, without due process of law;

The Complaint, as filed by the United States violates Girod's 1st Amendment freedom of speech in several ways. First and foremost, the Complaint alleges that claims made in promotional material are not consistent with what the FDA requires.[1] Most of these "claims" are rather testimonials. Second, government, through the FDA, is seeking to control or mandate the

---

[1] Note that ¶15 of the Complaint alleges claims made on a website. Sam Girod is Amish and is prohibited by his religion from running a computer or website.

speech of a private citizen. Thus, it is clear that the government, through the FDA, is seeking to curtail and/or control Girod's freedom of speech.

The Complaint initially seeks to seize the products of Sam Girod in violation of his 4th and 5th Amendment rights to be free from unreasonable seizures and not to be deprived of his property without due process of law.

Daniel Webster is credited with the definition of due process of law with his statement in *Dartmouth College v. Woodward*, 17 U.S. 518, 581-582, 4 L.Ed. 629 (1819), where he stated,

> "By the law of the land is most clearly intended the general law; a law which hears before it condemns, which proceeds upon the inquiry and renders the judgment only after trial. The meaning is, that every citizen shall hold his life, liberty, property and immunities, under the protection of the general rules which govern society. Everything which may pass under the form of an enactment, is not, therefore, to be considered the law of the land. If this were so, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments, decrees and forfeitures, in all possible forms, would be the law of the land. Such a strange construction would render constitutional provisions, of the highest importance, completely inoperative and void. It would tend directly to establish the union of all powers in the legislature. There would be no general permanent law for courts to administer, or for men to live under. The administration of justice would be an empty form, an idle ceremony. Judges would sit to execute legislative judgments and decrees; not to declare the law, or to administer the justice of the country."

Webster's understanding has been affirmed by several Supreme Court decisions. See *Hurtado v. California,* 110 U.S. 516, 535-536, 4 S.Ct. 111, 28 L.Ed 232 (1884); *Ex Parte Wall*, 107 U.S. 265, 289, 2 S.Ct. 569, 27 L.Ed. 552 (1883); *Hovey v. Elliott*, 167 U.S. 409, 418, 17 S.Ct. 841, 42 L.Ed 215 (1897); and *Powell v. Alabama*, 287 U.S. 45, 68, 53 S.Ct. 55, 77 L.Ed 158 (1932).

The purpose of the due process clause is perhaps most clearly explained in *Daniels v. Williams*, 474 U.S. 327, 331-332, 106 S.Ct. 662, 88 L.Ed2d 662 (1986). The Supreme Court stated,

> "By requiring the government to follow appropriate procedures when its agents decide to 'deprive any person of life, liberty, or property,' the Due Process Clause promotes fairness in such decisions. And by barring certain government actions regardless of the fairness of the procedures used to implement them, … it serves to prevent governmental power from being 'used for purposes of oppression.'" (Citations omitted).

Through the seizure of the Girod's property under admiralty procedures, the FDA has used the Federal Food, Drug and Cosmetic Act as a draconian power tool to deprive Girod of his previously mentioned inalienable and Constitutional rights and has become an oppressor. Seizing property under admiralty is not due process of law, because admiralty jurisdiction is maritime in nature. Since it is maritime in nature, is not the law of the land, but the international law of the high seas. Therefore, it is outside of the Constitution.

### 3. Admiralty Cases Do Not Arise Under the Constitution.

More than 130 years ago the Supreme Court ruled in *United States v. Winchester*, 99 U.S. 372, 374, 25 L.Ed 479 (1879), "Treating the proceedings in the District Court as in admiralty, they are without validity. The admiralty jurisdiction of the District Court extends only to seizures on navigable waters, not to seizures on land." Included in that concept was the understanding that admiralty and maritime jurisdiction comprised two types of cases:

1. Those involving acts committed on the high seas or other navigable waters; and
2. Those involving contracts and transactions connected with shipping employed on the seas or navigable waters.

"Admiralty and maritime jurisdiction is conferred by the Constitution, and Judge Story says it embraces two great classes of cases,--one dependent upon locality, and the other upon the nature of the contract. " See *Ex Parte Easton*, 95 U.S. 68, 72, 24 L.Ed. 373 (1877). Thus, admiralty jurisdiction "extends to all contracts, claims and services essentially maritime," *id*.

Since then the Supreme Court has ruled, "In amending and revising the maritime law, the Congress cannot reach beyond the constitutional limits which are inherent in the admiralty and

8

Case 4:12-cv-00362-GAF   Document 14   Filed 06/29/12   Page 8 of 17

maritime jurisdiction. Unless the injuries to which the Act relates occur upon the navigable waters of the United States, they fall outside that jurisdiction." *Crowell v. Benson*, 285 U.S. 22, 55, 52 S.Ct. 285, 76 L.Ed. 76 L.Ed 598 (1932) (Footnotes omitted). Recently, the Supreme Court clarified its understanding of admiralty jurisdiction. In *Exxon Corporation v. Central Gulf Lines, Inc.*, 500 U.S. 603, 608, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991), the court stated, "As we recently reiterated, the "fundamental interest giving rise to maritime jurisdiction is the 'protection of maritime commerce.'" *Sisson v. Ruby*, 497 U.S. 358, 367 (1990), quoting *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674 (1982)." This was also affirmed on page 611, "as noted, the admiralty jurisdiction is designed to protect maritime commerce."

From the earliest times of the United States the courts have understood that admiralty cases do not "arise under the Constitution or laws of the United States" but "are as old as navigation itself; and the law, admiralty and maritime as it has existed for ages, is applied by our Congress to the cases as they arise." See *American Ins. Co. v. Canter*, 26 U.S. 516, 545-546, 7 L.Ed. 242 (1828). This concept was affirmed in 1959 in *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). There Justice Frankfurter stated,

> It is the Constitution that is the ultimate source of all "judicial Power" -- defines grants and implies limits -- and so, "all Cases of admiralty and maritime Jurisdiction" arise under the Constitution in the sense that they have constitutional sanction. But they are not "Cases, in Law and Equity, arising under this Constitution, the Laws of the United States. . . ."

Since cases in admiralty do not arise under the Constitution, they are not subject to the Constitutional guarantees under the Bill of Rights. This is true because admiralty law is the law of the high seas, not the United States. Because Congress is prohibited from passing laws that are in violation of the limitation prescribed by the Constitution, see *Gibbons* and *Lopez*, *supra*, the United States had no jurisdiction to seize, nor does the district court have jurisdiction to entertain

9

a seizure action unless the United States proves jurisdiction by showing the articles of property owned by Sam Girod are connected to maritime activities or the seizure is used to for the "protection of maritime commerce," see *Exxon*, *supra*.

## C. Conclusion.

The allegations in the United States' Complaint contain no facts supporting that the articles listed in the Complaint were even remotely connected to maritime commerce. Since Congress may not violate Sam Girod's right to his property and the other Bill of Rights protections, absent any showing that Sam Girod's property was ever in maritime commerce, neither the United States, nor the FDA, has any jurisdiction to seize his property. Accordingly, due to a lack of jurisdiction and failure to state a claim Claimant Girod respectfully requests the District Court to dismiss the action and order the return of the seized property to him.

Respectfully submitted on June 29, 2012

/s/ Charles E. McFarland
Charles E. McFarland
Attorney at Law
338 Jackson Rd.
New Castle, Kentucky 40050
(502) 845-2754
mcfarlandc@bellsouth.net

### CERTIFICATION OF SERVICE

I, the undersigned, do hereby affirm that on June 29, 2012, the foregoing Rule 12(b) Motion to Dismiss was served via the CM/ECF filing system of the District Court on the attorney names below at his e-mail address of curt.bohling@usdoj.gov.

James Curt Bohling, AUSA
Chief, Monetary Penalties Unit
400 E. 9th Street, Fifth Floor
Kansas City Missouri 64106

/s/Charles E. McFarland
Charles E. McFarland

United States Statutes

Title 21. FOOD AND DRUGS

Chapter 9. FEDERAL FOOD, DRUG, AND COSMETIC ACT

Subchapter III. PROHIBITED ACTS AND PENALTIES

*Current through P.L. 112-90*

**§ 334. Seizure**

(a) **Grounds and jurisdiction**

   (1) Any article of food, drug, or cosmetic that is adulterated or misbranded when introduced into or while in interstate commerce or while held for sale (whether or not the first sale) after shipment in interstate commerce, or which may not, under the provisions of section 331 (ll), 344, or 355 of this title, be introduced into interstate commerce, shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court of the United States or United States court of a Territory within the jurisdiction of which the article is found. No libel for condemnation shall be instituted under this chapter, for any alleged misbranding if there is pending in any court a libel for condemnation proceeding under this chapter based upon the same alleged misbranding, and not more than one such proceeding shall be instituted if no such proceeding is so pending, except that such limitations shall not apply

     (A) when such misbranding has been the basis of a prior judgment in favor of the United States, in a criminal, injunction, or libel for condemnation proceeding under this chapter, or

     (B) when the Secretary has probable cause to believe from facts found, without hearing, by him or any officer or employee of the Department that the misbranded article is dangerous to health, or that the labeling of the misbranded article is fraudulent, or would be in a material respect misleading to the injury or damage of the purchaser or consumer. In any case where the number of libel for condemnation proceedings is limited as above provided the proceeding pending or instituted shall, on application of the claimant, seasonably made, be removed for trial to any district agreed upon by stipulation between the parties, or, in case of failure to so stipulate within a reasonable time, the claimant may apply to the court of the district in which the seizure has been made, and such court (after giving the United States attorney for such district reasonable notice and opportunity to be heard) shall by order, unless good cause to the contrary is shown, specify a district of reasonable proximity to the claimant's principal place of business, to which the case shall be removed for trial.

(2) The following shall be liable to be proceeded against at any time on libel of information and condemned in any district court of the United States or United States court of a Territory within the jurisdiction of which they are found:

  (A) Any drug that is a counterfeit drug,

  (B) Any container of a counterfeit drug,

  (C) Any punch, die, plate, stone, labeling, container, or other thing used or designed for use in making a counterfeit drug or drugs,

  (D) Any adulterated or misbranded device, and

  (E) Any adulterated or misbranded tobacco product.

(3) (A) Except as provided in subparagraph (B), no libel for condemnation may be instituted under paragraph (1) or (2) against any food which-

   (i) is misbranded under section 343 (a)(2) of this title because of its advertising, and

   (ii) is being held for sale to the ultimate consumer in an establishment other than an establishment owned or operated by a manufacturer, packer, or distributor of the food.

  (B) A libel for condemnation may be instituted under paragraph (1) or (2) against a food described in subparagraph (A) if-

   (i) (I) the food's advertising which resulted in the food being misbranded under section 343 (a)(2) of this title was disseminated in the establishment in which the food is being held for sale to the ultimate consumer,

      (II) such advertising was disseminated by, or under the direction of, the owner or operator of such establishment, or

      (III) all or part of the cost of such advertising was paid by such owner or operator; and

   (ii) the owner or operator of such establishment used such advertising in the establishment to promote the sale of the food.

(b) **Procedure; multiplicity of pending proceedings**

The article, equipment, or other thing proceeded against shall be liable to seizure by process pursuant to the libel, and the procedure in cases under this section shall conform, as nearly

2

as may be, to the procedure in admiralty; except that on demand of either party any issue of fact joined in any such case shall be tried by jury. When libel for condemnation proceedings under this section, involving the same claimant and the same issues of adulteration or misbranding, are pending in two or more jurisdictions, such pending proceedings, upon application of the claimant seasonably made to the court of one such jurisdiction, shall be consolidated for trial by order of such court, and tried in

(1) any district selected by the claimant where one of such proceedings is pending; or

(2) a district agreed upon by stipulation between the parties. If no order for consolidation is so made within a reasonable time, the claimant may apply to the court of one such jurisdiction and such court (after giving the United States attorney for such district reasonable notice and opportunity to be heard) shall by order, unless good cause to the contrary is shown, specify a district of reasonable proximity to the claimant's principal place of business, in which all such pending proceedings shall be consolidated for trial and tried. Such order of consolidation shall not apply so as to require the removal of any case the date for trial of which has been fixed. The court granting such order shall give prompt notification thereof to the other courts having jurisdiction of the cases covered thereby.

(c) **Availability of samples of seized goods prior to trial**

The court at any time after seizure up to a reasonable time before trial shall by order allow any party to a condemnation proceeding, his attorney or agent, to obtain a representative sample of the article seized and a true copy of the analysis, if any, on which the proceeding is based and the identifying marks or numbers, if any, of the packages from which the samples analyzed were obtained.

(d) **Disposition of goods after decree of condemnation; claims for remission or mitigation of forfeitures**

(1) Any food, drug, device, tobacco product, or cosmetic condemned under this section shall, after entry of the decree, be disposed of by destruction or sale as the court may, in accordance with the provisions of this section, direct and the proceeds thereof, if sold, less the legal costs and charges, shall be paid into the Treasury of the United States; but such article shall not be sold under such decree contrary to the provisions of this chapter or the laws of the jurisdiction in which sold. After entry of the decree and upon the payment of the costs of such proceedings and the execution of a good and sufficient bond conditioned that such article shall not be sold or disposed of contrary to the provisions of this chapter or the laws of any State or Territory in which sold, the court may by order direct that such article be delivered to the owner thereof to be destroyed or brought into compliance with the provisions of this chapter, under the supervision of an officer or employee duly designated by the Secretary, and the expenses of such supervision shall be paid by the person obtaining release of the article under bond. If the article was imported into the United States and the person seeking its release establishes

3

(A) that the adulteration, misbranding, or violation did not occur after the article was imported, and

(B) that he had no cause for believing that it was adulterated, misbranded, or in violation before it was released from customs custody, the court may permit the article to be delivered to the owner for exportation in lieu of destruction upon a showing by the owner that all of the conditions of section 381 (e) of this title can and will be met. The provisions of this sentence shall not apply where condemnation is based upon violation of section 342 (a)(1), (2), or (6), section 351(a)(3), section 352 (j), or section 361 (a) or (d) of this title. Where such exportation is made to the original foreign supplier, then subparagraphs (A) and (B) of section 381 (e)(1) of this title and the preceding sentence shall not be applicable; and in all cases of exportation the bond shall be conditioned that the article shall not be sold or disposed of until the applicable conditions of section 381 (e) of this title have been met. Any person seeking to export an imported article pursuant to any of the provisions of this subsection shall establish that the article was intended for export at the time the article entered commerce. Any article condemned by reason of its being an article which may not, under section 344 or 355 of this title, be introduced into interstate commerce, shall be disposed of by destruction.

(2) The provisions of paragraph (1) of this subsection shall, to the extent deemed appropriate by the court, apply to any equipment or other thing which is not otherwise within the scope of such paragraph and which is referred to in paragraph (2) of subsection (a) of this section.

(3) Whenever in any proceeding under this section, involving paragraph (2) of subsection (a) of this section, the condemnation of any equipment or thing (other than a drug) is decreed, the court shall allow the claim of any claimant, to the extent of such claimant's interest, for remission or mitigation of such forfeiture if such claimant proves to the satisfaction of the court

(i) that he has not committed or caused to be committed any prohibited act referred to in such paragraph (2) and has no interest in any drug referred to therein,

(ii) that he has an interest in such equipment or other thing as owner or lienor or otherwise, acquired by him in good faith, and

(iii) that he at no time had any knowledge or reason to believe that such equipment or other thing was being or would be used in, or to facilitate, the violation of laws of the United States relating to counterfeit drugs.

(e) **Costs**

When a decree of condemnation is entered against the article, court costs and fees, and

storage and other proper expenses, shall be awarded against the person, if any, intervening as claimant of the article.

(f) **Removal of case for trial**

In the case of removal for trial of any case as provided by subsection (a) or (b) of this section-

(1) The clerk of the court from which removal is made shall promptly transmit to the court in which the case is to be tried all records in the case necessary in order that such court may exercise jurisdiction.

(2) The court to which such case was removed shall have the powers and be subject to the duties, for purposes of such case, which the court from which removal was made would have had, or to which such court would have been subject, if such case had not been removed.

(g) **Administrative restraint; detention orders**

(1) If during an inspection conducted under section 374 of this title of a facility or a vehicle, a device or tobacco product which the officer or employee making the inspection has reason to believe is adulterated or misbranded is found in such facility or vehicle, such officer or employee may order the device or tobacco product detained (in accordance with regulations prescribed by the Secretary) for a reasonable period which may not exceed twenty days unless the Secretary determines that a period of detention greater than twenty days is required to institute an action under subsection (a) of this section or section 332 of this title, in which case he may authorize a detention period of not to exceed thirty days. Regulations of the Secretary prescribed under this paragraph shall require that before a device or tobacco product may be ordered detained under this paragraph the Secretary or an officer or employee designated by the Secretary approve such order. A detention order under this paragraph may require the labeling or marking of a device or tobacco product during the period of its detention for the purpose of identifying the device or tobacco product as detained. Any person who would be entitled to claim a device or tobacco product if it were seized under subsection (a) of this section may appeal to the Secretary a detention of such device or tobacco product under this paragraph. Within five days of the date an appeal of a detention is filed with the Secretary, the Secretary shall after affording opportunity for an informal hearing by order confirm the detention or revoke it.

(2) (A) Except as authorized by subparagraph (B), a device or tobacco product subject to a detention order issued under paragraph (1) shall not be moved by any person from the place at which it is ordered detained until-

(i) released by the Secretary, or

5

(ii) the expiration of the detention period applicable to such order,

whichever occurs first.

(B) A device subject to a detention order under paragraph (1) may be moved-

(i) in accordance with regulations prescribed by the Secretary, and

(ii) if not in final form for shipment, at the discretion of the manufacturer of the device for the purpose of completing the work required to put it in such form.

(h) **Administrative detention of foods**

(1) **Detention authority**

(A) **In general**

An officer or qualified employee of the Food and Drug Administration may order the detention, in accordance with this subsection, of any article of food that is found during an inspection, examination, or investigation under this chapter conducted by such officer or qualified employee, if the officer or qualified employee has reason to believe that such article is adulterated or misbranded.

(B) **Secretary's approval**

An article of food may be ordered detained under subparagraph (A) only if the Secretary or an official designated by the Secretary approves the order. An official may not be so designated unless the official is the director of the district under this chapter in which the article involved is located, or is an official senior to such director.

(2) **Period of detention**

An article of food may be detained under paragraph (1) for a reasonable period, not to exceed 20 days, unless a greater period, not to exceed 30 days, is necessary, to enable the Secretary to institute an action under subsection (a) of this section or section 332 of this title. The Secretary shall by regulation provide for procedures for instituting such action on an expedited basis with respect to perishable foods.

(3) **Security of detained article**

An order under paragraph (1) with respect to an article of food may require that such article be labeled or marked as detained, and shall require that the article be removed

6

(ii) the expiration of the detention period applicable to such order,

whichever occurs first.

(B) A device subject to a detention order under paragraph (1) may be moved-

(i) in accordance with regulations prescribed by the Secretary, and

(ii) if not in final form for shipment, at the discretion of the manufacturer of the device for the purpose of completing the work required to put it in such form.

(h) **Administrative detention of foods**

(1) **Detention authority**

(A) **In general**

An officer or qualified employee of the Food and Drug Administration may order the detention, in accordance with this subsection, of any article of food that is found during an inspection, examination, or investigation under this chapter conducted by such officer or qualified employee, if the officer or qualified employee has reason to believe that such article is adulterated or misbranded.

(B) **Secretary's approval**

An article of food may be ordered detained under subparagraph (A) only if the Secretary or an official designated by the Secretary approves the order. An official may not be so designated unless the official is the director of the district under this chapter in which the article involved is located, or is an official senior to such director.

(2) **Period of detention**

An article of food may be detained under paragraph (1) for a reasonable period, not to exceed 20 days, unless a greater period, not to exceed 30 days, is necessary, to enable the Secretary to institute an action under subsection (a) of this section or section 332 of this title. The Secretary shall by regulation provide for procedures for instituting such action on an expedited basis with respect to perishable foods.

(3) **Security of detained article**

An order under paragraph (1) with respect to an article of food may require that such article be labeled or marked as detained, and shall require that the article be removed

6

to a secure facility, as appropriate. An article subject to such an order shall not be transferred by any person from the place at which the article is ordered detained, or from the place to which the article is so removed, as the case may be, until released by the Secretary or until the expiration of the detention period applicable under such order, whichever occurs first. This subsection may not be construed as authorizing the delivery of the article pursuant to the execution of a bond while the article is subject to the order, and section 281 (b) of this title does not authorize the delivery of the article pursuant to the execution of a bond while the article is subject to the order.

(4) **Appeal of detention order**

  (A) **In general**

  With respect to an article of food ordered detained under paragraph (1), any person who would be entitled to be a claimant for such article if the article were seized under subsection (a) of this section may appeal the order to the Secretary. Within five days after such an appeal is filed, the Secretary, after providing opportunity for an informal hearing, shall confirm or terminate the order involved, and such confirmation by the Secretary shall be considered a final agency action for purposes of section 702 of title 5. If during such five-day period the Secretary fails to provide such an opportunity, or to confirm or terminate such order, the order is deemed to be terminated.

  (B) **Effect of instituting court action**

  The process under subparagraph (A) for the appeal of an order under paragraph (1) terminates if the Secretary institutes an action under subsection (a) of this section or section 332 of this title regarding the article of food involved.

7